BURKS, J.
"The bill in this case was filed by a husband against his wife, praying a divorce from the bond of matrimony on the ground of alleged desertion by the wife for a period exceeding five years. What purports-to be an answer to the bill by the wife was filed, depositions were taken by both parties, and at the hearing of the cause there was a decree of ^divorce according to the prayer of the bill, and further of an allowance to the wife of an annuity during her life, the payment of which was secured by a charge on the real estate of the husband. The husband is the appellant here, and complains of so much of the decree as makes the allowance to the wife.
By the Code of 1873. ch. 105, jurisdiction of suits for annulling and affirming marriages, and for divorces from the bond of matrimony and from bed and board for causes specified, is vested in the circuit courts and (by subsequent statute) in the corporation courts, on the chancery side thereof.
Section 9 provides, “that such suits shall be instituted and conducted as other suits in equity, except that the bill shall not be taken for confessed; and whether the defendant answer or not, the case shall be heard independently of the admissions of either party in the pleadings or otherwise,” and that “costs may be awarded to either party, as equity and justice may require.”
Section 12 is in the following words: “Upon decreeing the dissolution of a marriage, and also upon decreeing a divorce, whether from the bond of matrimony or from bed and board, the court may make such further order as it shall deem expedient concerning the estate and maintenance of the parties, or either of them, and the care, custody, and maintenance of their minor children, and may determine with which of the parents the children shall remain; and the court may from time to time afterwards, on petition of either of the parents, revise and alter such decree concerning the care, custody and maintenance of the children, and make a new decree concerning the same, as the circumstances of. the parents and the benefit of the children may require.”
It will be observed that the court, in the exercise of *its jurisdiction over the persons and subjects mentioned in this last-named section, is invested with a very large discretion. We have to consider the nature and extent of that discretion and the exercise of it, so far only as it concerns “the estate and maintenance of the parties.” On this branch of the case I do not propose to extend my inquiries beyond this limit.
The exercise of discretionary power by a judge to whom it is confided is always more or less embarrassing, and what is said by an English writer, speaking of the British constitution and jurisprudence, applies as well to ours, that it is a principle consonant to the spirit of our constitution, and which may be traced as pervading the whole body of our jurisprudence, that optima est lex quae minimum relinquit arbitrio judiéis, opti-mus judex qui minimum sibi — that system of law is best which confides as little as possible to the discretion of the judge — that judge is the best who relies as little as possible on his own opinion. Broom’s Leg. Max. 84.
Discretio est discernere per legem quid sit justum, says my Lord Coke. 4 Ins. 4,1, and “discretion,” says Lord Mansfield, “when applied to a court of justice, means sound discretion guided by law. It must be governed by rule: it must not be arbitrary, vague and fanciful, but legal and regular.” Rex v. Wilkes, 2 Burr. R. 25, 39.
It is not an unlimited power, but in all cases, where by law, whether statute or common law, a subject is referred to the discretion of the court, that must be regarded as a sound discretion, to be exercised according to the circumstances of each particular case. Daniel, J., in Commonwealth v. Wyatt, 6 Rand. 694, 700. And Judge Christian, speaking of the allotment of alimony, citing Bishop on Mar. & Div. and other authorities, says, “that it is a matte, within the discretion of the court. Yet it is not an arbitrary but *330 a judicial discretion, *to be exercised in reference to established principles of law relating to the subject, and upon an equitable view of all the circumstances of the particular case.” Bailey v. Bailey, 21 Gratt. 43, 57.
These principles must guide us in the inquiry we are about to make, whether the learned judge of the circuit court, in the exercise of the discretion with which the law invested him, has erred in decreeing maintenance to the appellee during her life out of her husband’s estate, after decreeing on his behalf a divorce from the bond of matrimony. Under the English ecclesiastical law as a part of the common law, the court, independently of the section (12) copied from the Code, could not have decreed any such allowance. Alimony, or- an allowance for the maintenance of the wife, was never decreed on a divorce a vinculo matrimonii. It was confined to divorces from the bed and board, and was an incident of decrees of that character. It is plain, however, from the language of the section of the Code referred to, that the court mqy, in the exercise of its discretion, extend it to a decree of divorce from the bond of matrimony.
Alimony had its origin in the legal obligation of the husband, incident to the marriage state, to maintain his wife in a manner- suited to his means and social position, and although it is her right, she may by her misconduct forfeit it; and where she is the offender, she cannot have alimony on a divorce decreed in favor of the husband. So long as he has committed no breach of marital, duty, he is under no obligation to provide her a separate maintenance, for she cannot claim it on the ground of her own misconduct. 2 Bish. on Marriage & Divorce, § 377; Carr v. Carr, 22 Gratt. 168, 173.
By analogy, this rule' should be applied to a case of a decree a vinculo matri-monii. In such case, maintenance ^should not be allowed her for the same reason that . alimony would be denied to her under the same circumstances in a decree from bed and board. This principle would seem to apply strongly to cases under our statutes, by authority of which a decree for divorce from the bond of matrimony may be granted for causes for which under the ecclesiastical law a decree from bed and board only could be granted.
Assuming that the court in this case did not err in decreeing the divorce,, it would seem -to follow, on principle, that there should have been ño allowance of maintenance to the wife; or if principle piust be made to bend to circumstances, those circumstances must be very peculiar indeed, if any such there could be, which, justifying a decree for an absolute divorce in behalf of the husband for wilful desertion by his wife, would at the same time warrant a decree in her behalf that he should out of his own estate maintain her as long as she lived, although after the divorce she should become the wife of another.
The reason assigned in the decree for the allowance is, that although “the desertion and abandonment as charged in the plaintiff’s bill is proven by the evidence, the same was not without the fault of the plaintiff.”
Without determining whether “the fault of the plaintiff” would alone, in any case, be sufficient reason for making the allowance, if, on the evidence, the plaintiff was entitled to a divorce, let us look at all the circumstances of this case, and, “upon an equitable view,” see whether any or all of them combined would be sufficient to justify the allowance, and further, whether the alleged desertion was proven, for if it was not, the plaintiff’s bill should have been dismissed.
The answer to the bill was filed at rules. It does *not appear that any replication was put in, but this would seem to be immaterial, as the defendant took depositions as if there had been a replication. Code of 1873, ch. 177, § 4. The answer, although signed by counsel, was never signed by the defendant, nor was it ever sworn to by her, or by any other person. It does not appear whether it was considered by the court as filed, or whether it was treated as an answer at all. It is not referred to specialty in the decree. The recital is, that the “cause came on to be further heard on the papers, formerly read,” &c. There was no former hearing. There was an interlocutory order at a previous term entered “on motion of the defendant, by her counsel,” for an allowance to the defendant to enable her to make her defence in the cause and for her support, pendente lite, but no reference is made, in that order to the answer or other papers. Although no exception was filed to the answer and no motion made to strike it out, it may very well be doubted whether the paper can be considered as an answer at all. But if it" can be so considered, the utmost effect that can be claimed for it, as it seems to me, is that of an answer not under oath. Story’s Eq. Plead., §§ 874, 875a, 875c, 876, and notes; 1 Daniel’s Ch. Prac. (4th Amer. ed.), 736, 737, and notes. See Thornton v. Gordon, &c., 2 Rob. R. 719. I shall treat it, however, in what I have to say, as if it were an answer under oath and regular in all respects. So treated, such an answer (excluding admissions) is entitled to the same "weight in the divorce suit as an answer in any other chancery suit would be. As far as responsive, it is evidence for the respondent, and to that extent must prevail, unless overcome by the requisite proof. Affirmative statements must, of course, be proved. Bailey v. Bailey, 21 Gratt. 43, 50; Latham, by, &c., v. Latham, 30 Gratt. 307; Shurtz & als. v. Johnson & als., 28 Gratt. 657, 661.
*The appellant and appellee were married in the spring of the year 1861. The appellant resided in the county of Nelson and is represented by the appellee in her answer as being, at the time of the marriage, “a bachelor of ripe years.” He seems to have been well-disposed, and is spoken of by one of the witnesses' as “a very amiable man, of kind temper,” but close — “penurious and miserly,” says the appellee in her answer — ■ “not very dressy,” says a witness, and not, in his opinion, “possessing very winning ways *331 for a young lady.” He owned property estimated by one witness as worth from $15,000 to $20,000, but by another more accurately, probably, at $12,000. His property c( nsisted chiefly of slaves and a tract of land, the most valuable portion of his estate being the slaves, some ten in number. The slaves, of course, were lost by the results of the war, and his estate, at the time of the institution of this suit, was considered as worth about $3,500.
The appellee resided in the town of Wil-liamsburg. It does not appear what her age vers, but she is represented by one of the witnesses as “apparently young, moderately handsome” — “moved in good society, and was an accomplished young lady.” She seems to have been poor. In response to a question concerning her estate, a witness said, “I have always heard she had some interest in the estate of a relation of hers, but I saw nothing of it to my knowledge.”
She first made the acquaintance of the appellant about three months before the marriage, at the house of Mr. John M. Shelton, whither she came on a visit to her sister, who was teaching school in Shelton’s family, and, it is said, was well acquainted with the appellant, having known him for about two years. The parties were married at Williamsburg and came at once to Nelson, and after spending some eight or ten days at *Mr. John M. Shelton's, went to appellant’s house to reside. Three of the appellee's sisters, it seems, were with her. In a very short time, a disturbance arose in the family, growing out of alleged disobedience and insubordination of the appellant’s servants to the appellee, (of which I shall have more to say presently) which led to the removal, at her request ami with her consent, of the appellee and her sisters to a house, leased by the appellant at a place called Raber’s mills, some three miles distant from his home. Here she continued to reside with her sisters for nearly two years, the appellant visiting her occasionally. In the mean time, the domestic peace was further disturbed by notices posted in the neighborhood by the appellant forbidding the public to credit his wife for purchases on his account. This induced her to threaten him with a suit for alimony, which caused him. as she says, to supply her with three hundred and fifty dollars. (Confederate currency, T presume). A reconciliation, however, took place, through the intervention of friends, and she and her sisters again returned to appellant’s house to reside. Very soon after her return, according to her statement the disturbances which occasioned her first withdrawal from her husband’s house were renewed, and she thereupon left his house, went to Norfolk, where she took up her residence, and was never again in Nelson county until after the institution of this suit, her absence extending through a period of more than fourteen consecutive years.
The reasons assigned by her for leaving her husband’s house will he best stated in her own language; and at the risk of being considered tedious, I shall copy from her answer to the bill. After speaking of the pleasant sojourn with her husband at the house of their mutual friend immediately after the marriage, during which their relations were agreeable and cordial *and gave promise of a happy future, “notwithstanding the disparative years.” Such is her language. She proceeds: “After a short time, respondent was carried by the plaintiff to his own home, where she undertook faithfully to discharge the duties of a wife by managing the household department, and thus rendering the house of the plaintiff comfortable and agreeable; but it became soon manifest the servants were unwilling to be controlled by her, and ultimately became rebellious. Respondent appealed to the plaintiff either to sustain her authority or to act himself with firmness and decision, so as to enforce obedience to her orders as mistress of the house, but from some cause he failed to do either, and she was rendered powerless to manage and control her domestic affairs, the duties of which devolved upon her by virtue of her marriage. In this state of affairs, she asked the plaintiff to remove her to some convenient point where a home could be rendered agreeable and she could be rid of the annoyance of said servants. It is true, that in answer to such request the plaintiff did rent a house at Raber’s mills, which they made their home. Respondent shows further, that their sojourn at Raber’s mills at first was pleasant and agreeable, but after awhile the mind of the plaintiff was influenced, as respondent verily believes, by interested and designing parties, through whose officiousness the plaintiff was made to believe that respondent ’’"is not only extravagant, but wasteful, and that his means would soon depart from him; these designing persons being none other than the relations of the plaintiff, who had hoped to inherit his estate in the event he had died without being married. Respondent shows that she was not extravagant, but economical and prudent, and careful of the interests of her husband; but he being penurious and miserly, gave credit to the reports of her extravagance, and '"absolutely posted her by hand-bills in the neighborhood, warning all persons against crediting her on his account, and thus cut off from her the necessaries of life and the means of living. This was done whilst they were living together as man and wife. So soon as she was informed of this proceeding upon the part of the plaintiff, she declined to recognize him as her husband, as he had denied his obligation in refusing to discharge his duty as such. She has never had occasion to regret her course in that, and feels now an honest conviction that she hut discharged a duty to herself as a lady of honor and refinement. Respondent, although thus insulted before the public and her pride wounded, did not abandon the plaintiff or leave his neighborhood, but remained in the rented house at Paber’s mills, and employed counsel to institute a suit for alimony, which suit respondent was of opinion had been brought, as she received the sum of three *332 hundred and fifty dollars and the furniture then in her possession in said rented house, but she is now informed that the records do not show that any such proceedings were ever instituted. She therefore presumes that her counsel obtained that concession from the plaintiff without a resort to a suit. She shows further, that thereafter a reconciliation was reached, the posters Being withdrawn by the plaintiff and authority given to the public to sell respondent as his wife such things as she might want. Indeed, the relations between them became so perfectly satisfactory that it was determined she should return to live at his home upon his farm, which she did, taking the furniture with her; but respondent shows that she had been there but a short time when the same rebellious spirit manifested itself upon the part of the servants, who exhibited .a determined purpose not to submit to her authority, but to rid themselves of her presence if *possible, and the plaintiff remained from some cause unknown to her, passive and indifferent, and although an assault was made' upon her by one of the female servants with a chair, which she was enabled as' it were by supernatural strength to fend off, respondent was not and is not now able to account for the reason why the plaintiff did not protect his wife from insult and danger at the hands of his slaves. Whether it was the result of long indulgence or of worse habits, she is unable to divine. She made no charge against his morals then, nor does she now, but his conduct was such as to justify a suspicion which, coupled with recent developments, might almost amount to a reasonable conviction. Yet respondent refrains from making any charge upon this head, save that the plaintiff was unmindful and derelict in his duty, and did not maintain the authority of his wife and sustain her in the discharge of her duty, but permitted her to be insulted in her home by menial slaves. Respondent confesses that being disappointed in the treatment she received at the hands of the plaintiff, with spirits broken, shattered health, mind harrassed and perplexed, and despairing of living with plaintiff as she had hoped, she did leave his house, but not against his consent. She is advised that in the eyes of God and man she was justified in so doing.”
I have given this full extract from the answer, because it presents specifically and in detail the only reasons alleged by the appellee for the abandonment charged in the bill. The bill charges briefly, that without fault of the plaintiff, the defendant “wilfully deserted and abandoned him and has not returned, and now resides and has for some time resided in the city of Norfolk.” It is obvious, that very little of the answer is responsive to the allegations. Certainly, the specific statements of the reasons for the *appellee leaving her home and her husband, which are given as a justification or excuse for her conduct, are affirmative, and can be of no avail as a defence without proof in support of them. I have looked most carefully through the record to see if there was any such proof, and there is absolutely none. Several witnesses speak of the appellant as being kind and indulgent to his servants; and one of the witnesses says that he has heard the appellee “make frequent complaints of the servants, and that Mr. Harris did not manage them according to her notions.” This testimony alone has little or no force, and if there is anything else in this record that tends in the remotest degree to sustain the. statements of the answer in regard to the troubles alleged to have arisen from the disobedience, insolence, and insubordination of appellant’s servants and his indifference to their conduct and failure to support the appellee in the exercise of her rightful authority over them, it has entirely escaped my attention. There is no proof in corroboration of her statements in this respect, and the character of this suit and the well established rules of pleading forbid us to assume important facts as true, of which no proof is given or attempted.
It is worthy of notice in this connection that the course of conduct attributed to the appellant and the specific facts which are made the ground of complaint are of such a nature as to be quite susceptible of proof; and if they existed as stated and escaped the observation of persons living in the neighborhood, some of whom testified in the case, still they must have been known to the sisters of the appellee, or to some of them, who seem to have been generally, one of them at least, constantly with the appellee from the time of her marriage until she left the appellant’s house; and *yet neither of these sisters is examined as a witness, and no reason is shown why such examination was not had. Besides, if the presence of the servants, and their disobedience, insubordination, and resistence to her lawful authority, and the failure of her husband to interpose for her protection, were the real, and, as to be inferred from the answer, the only causes of the abandonment, these causes must have been removed in a very short time after she left. She quit the place some time in the year 1863. The negroes became free by the result of the war in 1865, and, no doubt, immediately dispersed, as was usually the case. And yet she did not return to her husband nor offer to do so. The suggestion, thrown out in the answer, of a suspicion affecting the moral character of the appellant as to the possible cause of his inactivity and non-interference in behalf of the appellee in her troubles with the ne-groes, derives no support from the evidence. Indeed, the appellee expressly refrains from making any charge against the appellant affecting his moral character, and the suggestion need not be further noticed.
The conduct of the appellant in forbidding the public to give the appellee credit on his account, may have been reprehensible; but separated from her, as he then was, and she being attended by three of her sisters, his penurious disposition may have impelled him to this course, under apprehension, whether reasonable or not, that his credit might be used in the support of the three sisters. However that may be, the appellee does not in her answer assign this conduct *333 as one of the reasons for the abandonment. On the contrary, she says that after this “a reconciliation was reached, the posters being withdrawn by the plaintiff and authority given to the public lo sell (her) respondent as his wife such things as she might want. “Indeed,” "she continues, “the relations between them became so perfectly satisfactory that it was determined she should return to live at his home upon his farm, which she did,” &c.
In the absence of all proof touching the only matters alleged by the appellee by way of excuse or justification for the abandonment of her husband, I confess I find nothing in the record that seems to warrant the assumption in the decree, that this abandonment was “not without the fault of the plaintiff.” Pie may have been in fault. If he was, I can only say that it is not shown. He was penurious, it is true. That is proved. But mere penuriousness is no excuse for desertion. If it extends to a persistent denial of necessaries, when he has the means to supply them, it may amount to cruelty, and be good cause for abandonment. 1 Bishop on Mar. & Div. § 735. It is not pretended that the appellant ever withheld from his wife anything that was needful for her sustenance and comfort, except that for a time, the occasion before alluded to, he forbade the public to credit her on his account, and this offence seems to have been condoned. It is not pretended that his house was not supplied with the requisite comforts and conveniences, for that is proved. It is not alleged that he ever spoke a harsh or unkind word to his wife, or treated her otherwise than kindly, except in his failure to maintain her authority in the difficulties she had with the negroes, and of that there is no proof. The only matters of excuse or justification alleged for the abandonment have been fully considered, and being without proof, they must, as a defence, be without effect.
It is charged in the answer that the appellant was under the influence of his relatives, who had been looking to inherit his estate, and being disappointed *by his marriage, sought to disturb the domestic peace. There is not the least evidence to sustain this charge.
How far, if at all, the sisters of the ap-pellee may have influenced her conduct in this matter, I will not undertake to say; but the fact is prominent in the record, that one of them, at least, who seems never to have been absent from the appellee, was very hostile to the appellant. On one occasion, during the residence at Faber’s mills, the appellant sent a letter to his wife. She was sick and the messenger did not see her. He delivered it to the sister, who took it up stairs to the appellee, and after awhile came down with the letter in her hand, and after calling back the messenger, who had started off, he says she tore the letter in a hundred pieces in his presence, and then told him he might leave. The witness, if he knew, does not state the contents of the letter. It further appears, that after the return from _ Faber’s mills, and while this sister was living in the appellant’s house, he swore the peace against her and had her bound with a surety in a recognizance.
But whatever may have been the cause of the appellee’s departure and absence, I think, looking to the record alone, we are bound to say that she wilfully deserted her husband without justifiable cause.
Desertion, considered without reference to matter which may exist in justification, is the actual breaking off of the matrimonial cohabitation with an intent to desert in the mind of the offender, x Bishop on Mar. & Div. § 777.
A mere separation by mutual consent is not desertion in either party, nor as matter of proof can desertion be inferred against either from the mere unaided fact that they do not live together. The intent to desert may be proved, it is said, by a great variety of circumstances. Among those enum-crated in the case *of alleged desertion of the wife by the husband, is absence for a long time, not being necessarily detained by his occupation, business or otherwise.
This protracted absence, without necessary detention, is as potent proof of the intent to desert in case of the wife as of the husband. Bailey v. Bailey, 21 Gratt. 43. and cases cited; Carr v. Carr, 22 Gratt. 168; La-tham v. Latham, 30 Gratt. 307.
The authorities are not in perfect harmony on the question as to what constitutes legal justification for breaking off the matrimonial cohabitation. Bishop lays it down as the better doctrine, that “when a husband or wife breaks off cohabitation because of the alleged improper conduct of the other matrimonial partner, such conduct must have proceeded so far as to furnish ground for divorce, or the one so breaking off the cohabitation is guilty of the offence of desertion.” 1 Bishop on Mar. & Div. § 569. See also § 795 et seq. and cases cited.
The appellee, in her answer says, that she left the appellant’s house, but “not against his consent.” She does not say in direct terms that she left with his consent. The fact, nevertheless, stares us in the fact, that she left and went to a distant city and there took up her residence, and there remained for more than fourteen years, never once returning to her husband’s home, nor expressing a willingness, wish, or purpose to return. In the moan time, it seems she was made aware of the willingness of her husband to receive her back. A witness, John M. Shelton, is asked, “whether Mrs. Harris has been aware that Mr. Harris could or could not receive Mrs. Harris back to his house, if she chose to return.” His answer is, “I feel very sure that she was apprised of the fact of his willingness to take her back, from a conversation 1 had with her in Norfolk some two or three years ago I think.” And about a *year before this suit was brought, the appellant invited her to return to his house, bought supplies, made arrangements to receive her, and sent her money to bear her expenses home. She received the *334 money and treated the invitation with indifference — never came, and made no response.
It is true, that after the process in this suit had been served upon her, the appellee appeared in Nelson for the first time after a continuous absence of fourteen years, and sought and had an interview with her husband. Precisely what occurred m that interview has not transpired. We only know the result, that if reconciliation was the object, it was not effected.
In the conclusion of her answer, the ap-pellee says “if respondent could have been made comfortable and protected at home and her health had justified, she would have been willing to live with the plaintiff, and had offered to do so in his present affliction, but he spurns' the offer and says the law must take its course,” &c.
There is no proof of the "offer,” but if made, it is not difficult to surmise why the appellant rejected it. He might, I think, very reasonably have concluded, under the circumstances, that the^ offer was not prompted by conjugal affection or even a sense of duty; and such is the inference plaihly deducible from what she says in her answer. “Whilst respondent did not feel disposed to institute proceedings against the plaintiff in his lifetime and claim a support at his hands, yet she is unwilling to yield that right in his property after his death which the law gives her, or even tacitly to admit a wrongful abandonment of the plaintiff by failure to answer his bill. She is informed that the plaintiff is greatly afflicted in body with an incurable disease, which in the course of nature must soon end his days. She is truly sorry that in that state of health he has resorted to legal process under the hope the law *would sever the bonds which now bind them as man and wife, instead of waiting the inevitable result of time and disease, but as it has been his pleasure to do so, respondent claims for herself all the rights to which she is entitled under the law. She is advised that her departure from his house under the circumstances was right and proper, and her conduct justifiable; that she is now entitled under the law to alimony to be charged on his estate, and that if she should be the longest liver, she will be entitled to dower,” &c. If the offer 'to return was ever made, it came too late to be effectual as a defence. The husband's right to a divorce had long since become fixed, and he had brought his -suit to enforce it. An offer to return, made in good faith during the statutory period, will put an end to the desertion and bar the suit, but if the desertion has continued the number of years required by the .statute, the deserted party may then refuse to renew the cohabitation; and this refusal will not bar the already existing right. 1 Bishop, on Mar. & Div. § 810, and cases cited in note 5.
“There would seem to be nothing in the relative Condition, pecuniary or otherwise, of the parties, when the other circumstances 'of the case.are considered, that would justify the allowance made by the decree. There is no issue of the marriage. If the wife is afflicted in body and mind, as represented, the husband, according to her admission, is also “greatly afflicted in body with an incurable disease,” has passed the. age of three score years and ten, and “in the course of nature must soon end his days.” If she is poor, he .is far from being rich. The income, if any, from his small estate is probably not sufficient for his own support. The wife brought nothing to the husband at the marriage, she added nothing to his estate by her earnings, and if during the very brief period of .cohabitation, *she did not waste or unnecessarily consume any part of the estate, she did not remain to aid in preserving and taking care of it.
The court having properly, as I think, decreed in behalf of the husband a divorce from the bond of matrimony for the wilful desertion of him by the wife, I see nothing in the circumstance's of the case which make it proper to require the husband out of his estate to contribute to her maintenance after the divorce. I find no precedent for such an allowance in the decisions of this court, and I am unwilling to make one.
The unhappy condition of the appellee excites my commiseration; but courts of justice are not allowed to be controlled in their decisions by considerations of that character. “Compassion,” said an eminent Virginia chancellor, “ought not to influence a judge, in whom, acting officially, apathy is less a vice than sympathy.” Chancellor Wythe, Commentary on Field’s Ex’x v. Harrison & wife, Wythe’s Reports, (Minor’s Ed.) 282.
Carr v. Carr, 22 Gratt. 168, was a case which, in its circumstances, appealed strongly for sympathy in behalf of the young wife. The bill was filed by the husband for divorce from bed and board on account of alleged desertion by the wife, and for the custody of their infant child of very tender age. This court held that there was desertion on the. part of the wife, and no sufficient cause for it; and in delivering the opinion of the court, Judge Bouldin said: “In holding, as we do, that there was no sufficient cause for the desertion of the husband by the wife in this case, we must add that we are very far from holding the husband blameless. On the contrary, his conduct towards his' young and inexperienced wife has in many respects been in the highest degree reprehensible. He *has treated her with too little tenderness and consideration in the new and trying position in which she was placed. He has at times been coarse, rude, and petulant, when he should have been gentle, soothing, and affectionate. He has left her to bear alone burdens and trials which it .should- have been his highest pleasure to share and relieve; and he has been close, exacting and penurious with her, when he should have been, to the extent of his means, openhanded, liberal, and generous. We think he has much, very much, for which to reprove himself. Both parties have been to blame.” Although the husband was thus “not *335 without fault,” the divorce was granted, alimony denied to the wife, and custody of the infant child given to the husband.
I am of opinion to reverse so much of the decree appealed from as makes the allowance to the w-ife, and affirm the residue, without awarding costs to either party.
After charging the annuity upon the lands of the appellant, the decree further provides, that “the said annuity shall be in lieu of all dower-right which the said Sarah C. Harris (the appellee) might otherwise have in and to the real estate of the plaintiff, Daniel M. Harris (the appellant).”
Upon the principles recognized and acted upon by this court in the case of Porter v. Porter, 27 Gratt. 599, it would seem, by analogy, that the effect of a decree of divorce from the bond of matrimony, without any special provision in the decree as to the property rights of the parties, would be to extinguish, or arrest the consummation of the inchoate or incipient right of the wife to dower in the real estate of the husband. See 2 Bishop on Mar. and Div. §§ 706, 707, 708 et seq.; *1 Bishop on Law of Married Women, §§ 239, 347, 348 et seq.; 1 Minor’s Ins. 29-2.
If such would be the legal effect of the decree of divorce merely, there might be a question whether the court may not, under the broad and comprehensive discretion given by the statute "concerning the estate and maintenance of the parties, or either of them,” counteract this effect by specially providing that, notwithstanding the divorce, the inchoate dower-right shall be preserved to the wife and await the contingency by which it may become consummate.
If, on the other hand, the decree of divorce merely would not per se _ affect this inchoate right of dower, there might be the further question, whether the court, under the statute, may not control the right, and, as was ordered in the present case, bar it, and substitute, in lieu thereof, a vested interest, as money or other estate of the husband.
But in the view I have taken, it is not necessary to decide any of these questions in the present case, and I express no opinion upon them.
CHRISTIAN and STAPLES, J’s, concurred in the opinion of BURKS. J.